**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CHARLES HERBERT STYRON, <u>et</u> <u>al.</u>** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 03-0572-CG-L** |
| | ) | |
| **CITY OF FOLEY, <u>et</u> <u>al.</u>,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This cause is before the court on the motion of defendants, City Of Foley, James Miller , James Brown, Bruce Thrift, Darren Miller, Tony Nelson, and Heidi Loftis, for summary judgment (Doc. 44), plaintiffs' response thereto (Doc. 64), and defendants' reply (Doc. 70).  For the reasons stated below, the court finds that defendants' motion is due to be granted.

<u>**FACTS**</u>

This case arises from alleged injuries plaintiffs received on August 26, 2001.  On that date, plaintiffs were burning their fields for farming purposes. (H. Styron Depo. p. 13).  Officer Heidi Loftis observed thick smoke coming over County Road 12 which made it difficult for drivers to safely navigate the road. (Transcript pp. 15-16).  Loftis stopped and spoke to Terry Styron about the problem with the smoke. (T. Styron Depo. p. 22).  Loftis reportedly told Terry Styron to put out the fire, he agreed, and she left. (Transcript pp. 21-22).  Shortly thereafter, officers were dispatched to the area because the smoke was still affecting visibility on the road. (Transcript pp. 97-98).  The officers informed Herbert Styron that they would have to put out the fire. (Transcript p. 225).  Shortly thereafter, a physical confrontation occurred between Herbert

1

Styron and Officer Shawn Miller, and Herbert Styron was sprayed in the face with pepper spray. (H. Styron Depo. pp. 28-30, Transcript p. 226).  Officer Shawn Miller wrestled with Herbert Styron, trying to get handcuffs on him. (Transcript p. 226).  Herbert Styron would not let the officer put handcuffs on him. (Transcript p. 226).   According to Herbert Styron, three or four officers joined in the struggle. (Transcript p. 227).  Herbert Styron testified that he gave up his hands and the officers still would not get off of him. (Transcript p. 227).  Herbert Styron contends that after he was handcuffed and flat on the ground, officers kept punching and kicking him. (H. Styron Depo. pp. 37-39, Transcript p. 228).  Herbert Styron says he saw the officers attacking Terry and so he ran to jump on top of Terry to protect him, but an officer grabbed him by the handcuffs, hit him in the head with a billy club and threw him in the ditch and jumped on his back. (H. Styron Depo. p. 43).

At some point during the confrontation with Herbert Styron, the Fire Chief, Richard Glen, approached Terry and attempted to take from Terry a rake he was carrying and a struggle ensued.  (T. Styron Depo. p. 43).  Officer Loftis intervened and reportedly told Terry Styron he was under arrest. (Transcript pp. 27-28).  Loftis and Terry Styron began walking to the police car, but Terry Styron allegedly struck Loftis in the back of the head. (Transcript pp. 28-29). According to Terry Styron, Loftis, without provocation, told him to go to her car, that she was going to spray him. (Transcript pp. 199, 219).  A struggle ensued and Terry Styron took the pepper spray from Loftis.  (Transcript p. 200).   Terry Styron said it was at that time that he noticed the confrontation between the officers and his father. (Transcript p. 200).  Terry helped get his father up on his knees and tried to wipe the pepper spray out of his fathers eyes with a handkerchief from his pocket. (Transcript pp. 202, 227-28).  According to Terry Styron, his

father, Herbert, was handcuffed by that time. (Transcript p. 202).  Shortly thereafter, officers reportedly grabbed Terry by his shoulders and told him to get in the patrol car. (Transcript p. 203).   Terry claims the officers then hit him with a baton. (Transcript p. 204).   Terry Styron claims officers pushed him down and started beating him with a stick. (Transcript p. 204). According to Terry Styron, after the officers beat him, he handed the pepper spray back to the officers and then put his hands behind him for them to cuff him. (Transcript p. 206).  According to Terry, after  he was cuffed, the officers sprayed him with pepper spray (T. Styrone Depo. p. 77, Transcript p. 207).  According to the officers, Terry Styron became violent, kicking officer Nelson in the groin. (Transcript pp. 31-35, 151-154).  Terry Styron was not handcuffed during this physical confrontation with the officers. (Transcript pp. 31, 152).  He was then taken to the police station where he was finally allowed to wash the pepper spray from his eyes, but the water cut off before he was able to finish and he was unable to see for another hour. (Transcript p. 209, T. Styron Depo. 82-83).   When Terry Styron was being checked in, he told the officers that he was hurting badly, but they told him they did not care and nothing was done. (T. Styron Depo. pp. 95-96).  The officers asked him if he was on any medication or had any medical conditions, and he answered "no." (T. Styrone Depo. p. 95).  In his jail cell, Terry Styron was given a wash cloth and was finally able to get some water to finish washing the pepper spray out of his eyes. (T. Styron Depo. pp. 85-86).  Terry Styron stayed in the jail from Sunday afternoon until Tuesday morning. (T. Styron Depo. p. 90).  According to Terry Styron, a county officer came to pick him up to take him to Bay Minette three times, but the officers at the jail where he was in custody told him they did not have the paperwork ready. (T. Styron Depo. pp. 87-88).  Terry Styron also claims he overheard officers talking on the phone reporting that the deputy had not

come yet to pick up Terry Styron, when, in fact, the deputy was standing at the desk. (T. Styron Depo. p. 88).   After being released from jail, Terry Styron went to the emergency room and was given a prescription for pain medication. (T. Styron Depo. p. 94).  He was later diagnosed with hernias. (T. Styron Depo. pp. 94, 100).

Herbert Styron got sick and passed out while being transported in the car.  Officer Nelson poured water on him and got him out of the car. (Transcript p. 229).  Herbert was taken by ambulance to the hospital. (Transcript p. 229).  He was later transported to the jail. (H. Styron Depo. p. 60).   At the jail, Herbert Styron took a pocket knife out of his pocket to give it to the officer, and the officer slammed him against the wall. (H. Styron Depo. pp. 60-61).  According to Herbert Styron, he was sick and threw up all night long, but the jailers, who could see him, did nothing to help. (H. Styron Depo. p. 65).  A female officer told him if he threw up on the floor he would have to clean it up. (H. Styron Depo. pp. 62-64).  He had no mattress to lay on in the cell. (H. Styron Depo. p. 67).  Herbert Styron states that he received pain medication from the hospital that night and that he gave a slip of paper that he thinks had instructions on when or how to take the medicine to an officer at the jail. (H. Styron pp. 98-101).  Herbert Styron cannot read and so did not know what the slip of paper said. (H. Styron p. 101).  He did not know what the instructions were. (H. Styron p. 102).  Herbert Styron asked for his blood pressure medicine and someone brought it to the jail and the jailer gave it to him. (H. Styron pp. 102-104).  Herbert Styron says he asked for the pain medication, but no one gave him the pain medication. (H. Styron Depo. pp. 104-105).  Chief James Miller states that the jailers and other officers on duty are vested with the responsibility of making sure that inmates receive proper care, and he does not generally go back and check up on them, but trusts that the people he put in those positions

will do their job. (Miller Depo. pp. 44-45).  Neither Terry nor Herbert Styron had their pictures

taken when they were booked into the jail, although that is the normal procedure to establish

their condition on arrival (Miller Depo. pp. 23-26).  Herbert Styron was photographed in the

morning. (H. Styron Depo. p. 64).  Herbert Styron told "them" when he was fingerprinted that he

had been cold during the night and early morning in his jail cell. (H. Styron Depo. p. 64).

According to Herbert Styron, he was still throwing up when he was being photographed and

fingerprinted. (H. Styron Depo. p. 65).   Terry and Herbert Styron were also denied visitation by

a family member and were not allowed bail release until August 28, 2001.

> Plaintiffs' expert witness, Charles A. Lindquist, Ph.D., opined the following:
>
> If testimony and additional reports indicate that the information presented in
> Section B.[1] of this report is basically correct, then it is clear that the Styrons were
> not properly protected from injury.  By their choices of action/inaction, the City
> of Foley Police Department demonstrated a callous disregard for the rights of
> Charles and Terry Styron.

(Doc. 65, Ex. 1, Lindquist Report p. 4, ¶ D).   Defendants' expert, Dennis Waller, is of the

opinion that:

> At the time of Charles Herbert Styron's incarceration the Foley Police
> Department had a reasonable policy and practice in place for providing health
> care services to occupants of the jail.  That policy appears to be consistent with
> nationally accepted standards of law enforcement practice.  Per the documentation
> provided, the policy appears to have been carried out in a reasonable and prudent
> manner.

---

[1] Section B of Lindquist's report includes plaintiffs' allegations that no immediate first
aid was provided to plaintiffs at the scene for their injuries, spray decontamination procedures
were not immediately instituted at the scene, Terry Styron was left in a closed police vehicle at
the police station for "some period of time" without receiving any medical attention, Charles
Styron was not allowed to take any of the medication provided by the hospital for his pain, both
prisoners were apparently denied visitation and were not allowed bail release until the morning
of August 28, 2001, and plaintiffs were injured as a result of their treatment by the City of Foley
Police Department.

(Doc. 71, Ex. 3 - Waller Supplemental Report p. 3, ¶ I).  Mr. Waller further states that Herbert

Styron was properly provided with documented medication, in that he received one dose of

Lotrel at 9:00 p.m. and that there was no documentation that Mr. Styron was in possession of any

additional medication. (Waller Supplemental Report p. 3, ¶ I(1)).  Mr. Waller states that "Jail

personnel are expected to monitor the activities of, and provide services for, occupants of the

jail.  In so doing, all medications must be documented and the distribution of same must be

carefully controlled per the prescribing physicians' orders." (Waller Supplemental Report p. 3, ¶

I(2)).

     Herbert Styron was charged and convicted by a jury of obstructing governmental

operations, resisting arrest, and assault in the third degree of Shawn Miller.  Terry Styron was

charged and convicted of obstructing governmental operations, resisting arrest, and assault in the

third degree of Heidi Loftis and Tony Nelson.  The jury was instructed that:

> a person commits the crime of obstructing governmental operations if by means of intimidation, physical
> act the person intentionally obstructs, impairs, or hinders the administration of law or other
> governmental function.  And the Legislature has defined a governmental function as any activity
> which a public servant is legally authorized to undertake on behalf of a government.

(Transcript p. 286).  As to the charge of resisting arrest, the jury was also instructed that:

> a person commits the crime of resisting arrest if the person intentionally prevents
> or attempts to prevent a peace officer from effecting a lawful arrest of himself or
> another person.

(Transcript p. 291).  Lastly, the jury was instructed that:

> a person commits the offense of assault in the third degree if he causes physical injury to
> any person with the intent to cause physical injury to that person.

                    * * * *

> And with respect to the charges of assault in the third degree, one of the issues is
> the defense named self-defense.  And the law says that a person is justified in

using physical force upon another person in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for the purpose.

(Transcript pp. 294-96).

## **LEGAL ANALYSIS**

### **A. Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).   "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249-250. (internal citations omitted).

The basic issue before the Court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle

7

Glade, 178 F.3d 1175, 1187 (11th Cir.1999).   "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir.1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment."  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e)  "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

**A. Plaintiffs' Claims**

Plaintiffs' complaint asserts state law claims for assault and battery, negligent supervision, outrage, and false imprisonment.  Plaintiffs also assert a claim under 42 U.S.C. § 1983 for defendants' violation of the 4th, 8th, and 14th Amendments to the Constitution of the United States.

**1. State law claims against the City**

By statute in Alabama, a municipality can only be held liable for injuries caused by the negligence of its agents, officers, or employees. ALA. CODE § 11-47-190.  Thus, the City of Foley cannot be held liable for the intentional actions of its officers. Id.; see also Brooks v. City of Birmingham, 584 So.2d 451 (Ala. 1991).  Nor can claims of wantoness be maintained against the City.  Hilliard v. City of Huntsville, 585 So.2d 889 (Ala. 1991).  In addition, Alabama law provides statutory immunity to law enforcement officers "from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." ALA.CODE § 6-5-338(a).  The statute also states that it "is intended to extend immunity only to peace officers and governmental units or agencies authorized to appoint peace officers." ALA.CODE § 6-5-338(b) (emphasis added).  The Alabama Court of Civil Appeals has concluded that "the plain language of  ALA.CODE 1975, § 6-5-338(b), clearly extends discretionary-function immunity to [a municipality]." Montgomery v. City of Montgomery, 732 So.2d 305, 312 (Ala. Civ. App. 1999).  Moreover, Alabama does not recognize an action against a municipality for negligent hiring, supervising, or training.  As this court has previously explained:

> Municipal liability under Section 11-47-190 is based on the doctrine of respondeat superior. E.g., City of Lanett v. Tomlinson, 659 So.2d 68, 70 (Ala. 1995).  For the employer to be liable under that doctrine, the employee must first be liable for a tort.  "If the agent is not liable for any tort, the principal is also absolved." Latham v. Redding, 628 So.2d 490, 495 (Ala. 1993).  Thus, to survive a motion for summary judgment, a plaintiff must first show that a species of tort exists for which the employee may theoretically be held liable.  In this case, the plaintiffs must show that Alabama law recognizes a cause of action against a supervisory employee for the negligent training or supervision of a subordinate.

Ott v. City of Mobile, 169 F.Supp.2d 1301,1314 (S.D. Ala. 2001).  In Ott, the court stated that it "is satisfied that no such cause of action exists." Id.  Even if Alabama recognized such causes of action, plaintiffs would be required to present evidence regarding the employer's constructive awareness of the employee's incompetency. Id. at 1315.  Plaintiffs have not done so here.  Therefore, summary judgment is due to be granted as to the state law claims asserted against the City of Foley.

**2. State law claims against the Officers**

Defendants assert that issue preclusion or collateral estoppel bars plaintiffs' state law claims for assault and battery and false imprisonment. "In this Circuit, the use of a criminal conviction as conclusive of an issue in subsequent civil litigation is well-established." Parris v. Town of Alexander City, 45 F.Supp.2d 1295, 1300 n 6 (M.D. Ala. 1999) (citing Matter of Raiford v. Abney, 695 F.2d 521, 523 (11th Cir.1983)). Plaintiffs were both convicted of obstructing governmental operations, resisting arrest, and assault in the third degree with regard to the incident in question. Thus, it has been conclusively established as necessary elements of plaintiffs' convictions that they intentionally obstructed, impaired, or hindered the administration of law or an activity which a public servant was legally authorized to undertake on behalf of a government. It is also conclusively determined that plaintiffs intentionally attempted to prevent a peace officer from effecting a lawful arrest of himself or another person. In addition, it has been determined that plaintiffs caused physical injury to Officers Shawn Miller, Heidi Loftis, and Tony Nelson with the intent to cause physical injury to them. Plaintiffs' use of physical force was not justified as self-defense.

As such, the court agrees that plaintiffs are precluded from asserting that their arrests or imprisonments were unlawful, or that the physical force used by the officers during those events was unlawful. A finding that plaintiffs' use of physical force was lawful is inconsistent with their conviction. The plaintiffs were found to have assaulted all three officers and cannot deny their actions in this subsequent civil litigation or claim they acted in self-defense. Although plaintiffs assert that some of the conduct at issue occurred after their arrest, they were convicted of assault and battery with regard to their specific actions towards all three officers - regardless of when the actual "arrest" occurred. For instance, Terry Styron was alleged to have hit Officer Loftis in the back of the head and to have taken the pepper spray from Loftis. At Terry Styron's criminal trial, this was the only conduct from which injury to Loftis was alleged to have resulted or been intended. Terry Styron's actions toward Loftis were conclusively determined to be

wrongful and were found not to constitute self-defense.  As such, the force used by Loftis could not have been excessive.  Plaintiffs allege that Terry merely followed Loftis and did what she told him to do, but that is directly contrary to what the jury found at his criminal trial.  Because Terry Styron's account cannot be reconciled with the jury's conclusion, he is precluded from asserting such claims.

The court also finds that plaintiffs have not asserted a viable claim of outrage.  The tort of outrage was first recognized under Alabama law in American Road Serv. Co. v. Inmon, 394 So.2d 361 (Ala. 1980).  To recover on the tort of outrage, the plaintiff must show that the defendant's conduct: (1) was intentional or reckless; (2) was extreme and outrageous and (3) caused emotional distress so severe that no reasonable person could be expected to endure it. Id., at 365; Thomas v. BSE Indus. Contractors, Inc., 624 So.2d 1041, 1043 (Ala. 1993); Ex parte Crawford & Co., 693 So.2d 458, 460 (Ala. 1997).  Outrage is a very narrowly recognized cause of action which imposes an extremely high burden on the plaintiff.  As the Inmon Court stated,

> Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. . . .  By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

Inmon, 394 So.2d at 365.  The Alabama Court of Civil Appeals has emphasized the narrow circumstances that may give rise to recovery.

> The tort of outrage was not developed to provide a person with a remedy for the trivial emotional distresses that are common to each person in his everyday life.  Such distress is the price of living among people... Thus, in order to prevent the tort of outrage from becoming a panacea for all of life's ills, recovery must be limited to distress that is severe.

U.S.A. Oil, Inc. v. Smith, 415 So.2d 1098, 1101 (Ala.Civ.App. 1982)(reversing judgment in favor of plaintiff who filed outrage claim after termination where former employer threatened criminal action against plaintiff for work misconduct.), cert. denied, 415 So.2d 1102.  In fact, the Alabama Supreme Court has recognized the tort of outrage in only three areas: "(1) wrongful

conduct within the context of family burials[2]; (2) an insurance agent's coercing an insured into settling an insurance claim[3]; and (3) egregious sexual harassment[4]." Callens v. Jefferson County Nursing Home, 769 So.2d 273, 281 (Ala. 2000).

Outside of these categories, shocking conduct is often deemed by Alabama courts to be insufficient to create a jury question. For example, in Grantham v. Vanderzyl, 802 So.2d 1077 (Ala. 2001), a surgical nurse sued Dr. Keith Vanderzyl, an orthopedic surgeon, on outrage and other claims. The plaintiff alleged that during an orthopedic procedure, the surgeon took "one of the surgical drapes containing the patient's blood and surgical refuse and threw it at Grantham." Upon seeing that "blood and fluids were on [the plaintiff's] face", the defendant remarked, "I don't give a damn." Grantham, 802 So.2d at 1079. The plaintiff was advised to consider herself HIV-positive, and she underwent periodic blood tests for HIV, hepatitis, and other diseases for one year. Id. The trial court granted summary judgment in favor of the defendant, and plaintiff appealed. On appeal, the Alabama Supreme Court affirmed the trial court's grant of summary judgment on the outrage claim. "The trial court correctly held that [plaintiff's] allegations, even if true, do not state conduct rising to the level required to constitute the tort of outrage under Alabama law." Id. at 1081. This is consistent with the Alabama Supreme Court's statement that it has "applied the Inmon test strictly, thereby allowing an outrage claim to go to the jury only in egregious cases." Ex parte Crawford & Co., 693 So.2d 458, 459 (Ala. 1997) (citing State Farm

---

[2]See e.g., Gray Brown-Service Mortuary, Inc. v. Lloyd, 729 So.2d 280 (Ala. 1999)(cemetery's secretive disinterment and gross abuse of corpse supported judgment in favor of plaintiff).

[3]See, e.g., National Security Fire & Cas. Co. v. Bowen, 447 So.2d 133, 141 (Ala. 1983)(insurance investigators' orchestration of false criminal charges against insured, threats of harm to insured's son, and holding insured at gunpoint to coerce settlement of insurance claim was conduct "so horrible, so atrocious, [and] so barbaric" as to constitute outrage).

[4]See, e.g., Machen v. Childersburg Bancorporation, 761 So.2d 981 (Ala. 1999)(reversing summary judgment on finding that evidence of repeated inappropriate sexual conduct by plaintiff's supervisor at work precluded summary judgment).

Automobile Ins. Co. v. Morris, 612 So.2d 440 (Ala. 1993); Gibson v. Southern Guaranty Ins. Co., 623 So.2d 1065 (Ala. 1993); Gibbs v. Aetna Casualty & Surety Co., 604 So.2d 414 (Ala. 1992); Farley v. CNA Ins. Co., 576 So.2d 158 (Ala. 1991); Empiregas, Inc. of Gadsden v. Geary, 431 So.2d 1258 (Ala. 1983)).

Given that plaintiffs have been found to have resisted a lawful arrest and assaulted Officers Miller, Loftis, and Nelson, the court finds that the alleged conduct was not "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." Inmon, 394 So.2d at 365. The court notes that there is no evidence that the defendant officers were responsible for plaintiffs' medical treatment and detention at the jail. Officer Nelson is alleged to have begun transporting Herbert Styron, however Mr. Styron's deposition testimony indicates that Nelson's conduct during the transport was not outrageous. The court finds that plaintiffs have not asserted a viable claim of outrage.

### 3. § 1983

Plaintiffs assert a claim against all defendants under 42 U.S.C. § 1983 for violation of the 4th, 8th, and 14th Amendments to the Constitution of the United States. Specifically, plaintiffs allege that defendant officers violated plaintiffs' constitutional rights by (1) arresting plaintiffs without probable cause, (2) maliciously beating and pepper spraying plaintiffs, (3) refusing to allow plaintiffs to wash the spray out of their eyes while in jail, (4) refusing to give plaintiffs blankets and medicine prescribed by a doctor, (5) refusing to release plaintiffs when plaintiffs had been released on bail by a Court officer. Plaintiffs allege that the City of Foley violated plaintiffs' constitutional rights in the following manner:

> by creating and maintaining a policy and custom of failing to properly train and improperly training its police officers and allowing them to leave their jurisdiction and unlawfully arrest persons outside of their jurisdiction, who furthermore had a legal permit from the State of Alabama to do what they were doing.

(Amended Complaint ¶ 31).

The Supreme Court of the United States has held that a defendant must first have his conviction overturned before he may properly bring a § 1983 claim for damages arising from that conviction. Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).  In Heck, the Court held that a civil tort action, including an action under 42 U.S.C. § 1983, is "not [an] appropriate vehicle[ ] for challenging the validity of outstanding criminal judgments." 512 U.S. at 486. Heck dictates that when a person convicted of aggravated assault against a police officer brings a § 1983 claim against arresting officers, the district court must first "consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." Hainze v. Richards, 207 F.3d 795, 798 (5 th Cir. 2000), quoting Heck, 512 U.S. at 487. If so, the claim is barred unless the conviction has been reversed or declared invalid.  Plaintiffs' convictions have not been reversed or declared invalid.  Plaintiffs' § 1983 claims may be entertained, therefore, only if a holding in the plaintiffs' favor will not necessarily call into question the validity of their convictions.  Applying this test, the court concludes that plaintiffs' claims that allege unlawful arrest and excessive force are not cognizable under §1983. See Hudson v. Hughes, 98 F.3d 868, 872 (5th Cir. 1996)(finding that neither the plaintiff's false arrest claim nor his excessive force claim were cognizable under § 1983).  Plaintiffs' convictions for resisting arrest, necessarily included as an element that the arrest was lawful.  Likewise, recovery for excessive force would imply the invalidity of plaintiffs' assault and battery convictions.  As the Hudson Court explained:

> Because self-defense is a justification defense to the crime of battery of an officer, Hudson's claim that Officers Defillo, Hingle, and Lanasa used excessive force while apprehending him, if proved, necessarily would imply the invalidity of his arrest and conviction for battery of an officer. This is true because the question whether the police applied reasonable force in arresting him depends in part on the degree of his resistance, which in turn will place in issue whether his resistance (the basis of his conviction for assaulting a police officer) was justified, which, if it were, necessarily undermines that conviction.

Id., at 873.  Thus, plaintiffs' claims that the officers arrested plaintiffs without probable cause and used excessive force by maliciously beating and pepper spraying plaintiffs are barred.

14

Likewise, plaintiffs' claims against the City of Foley for "allowing them to leave their jurisdiction and unlawfully arrest persons outside of their jurisdiction" are barred. A finding in favor of plaintiffs on such claims would necessarily imply the invalidity of plaintiffs' convictions since plaintiffs' convictions for resisting arrest included as an element that the arrests were lawful.

Plaintiffs' remaining claims do not fall under the limitations of <u>Heck v. Humphrey</u>. Plaintiffs' claims that the defendant officers refused to allow plaintiffs to wash the spray out of their eyes while in jail, to give plaintiffs blankets and medicine prescribed by a doctor, and to release plaintiffs when plaintiffs had been released on bail by a Court officer are not directly related to the facts underlying plaintiffs' convictions. These alleged actions did not occur at the scene of the arrest, but later that day, after the initial confrontation from which the convictions are based had come to an end. However, plaintiffs do not identify the officers who were allegedly responsible for the above conduct. No evidence was submitted to suggest that the officers named as defendants in this case were responsible directly. "[T]o hold these individual Defendants liable under § 1983, the Plaintiff must allege that they either actually participated in the alleged constitutional violation or that a causal connection exists linking their supervisory actions to the violation." <u>Smith v. Citrus County, Fla.</u>, 2005 WL 1065545, *3 (M.D. Fla. May 2, 2005) (citing <u>Lewis v. Smith</u>, 855 F.2d 736, 737 (11th Cir.1988)). The only officer plaintiffs allege is responsible in a supervisory capacity is Chief James Miller. However, as the court will discuss in more detail below with regard to the City's liability, there is no evidence that Chief Miller was aware of a need for additional training or supervision in the treatment of inmates.

Additionally, defendants claim they are entitled to qualified immunity. "Qualified immunity protects government officials performing discretionary functions from civil trials ... and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Lassiter v. Alabama A & M Univ.</u>, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (internal quotations and citations omitted). "The purpose

15

of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir.2002) (internal quotation marks and citations omitted).

To receive qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir.2002) (internal quotation marks omitted). Here the officers were clearly acting within their discretionary authority in arresting defendants, transporting them to jail, checking them in and managing the jail and the custody of plaintiffs. Plaintiffs admit that the individual defendants were acting pursuant to their discretionary authority. (Doc. 64, pp. 16-17). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Lee, 284 F.3d at 1194.

Plaintiffs must first show that they have stated a claim for a constitutional violation or a violation of a federal right. Marsh v. Butler County, Ala., 268 F.3d 1014, 1028 (11th Cir. 2001) (citation omitted); see also Selma Housing Development Corp. v. Selma Housing Authority, 2005 WL 1981290, *14 (S.D. Ala. Aug. 16, 2005) (stating that relief under § 1983 may be sought for constitutional violations as well as violations of certain rights created by federal statutes) (citation omitted). An official's "deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment." Id. (citing Helling v. McKinney, 509 U.S. 25, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993).

> An Eighth Amendment violation will occur when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not 'respond[ ] reasonably to the risk.'" Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 1982-83, 128 L.Ed.2d 811 (1994). A plaintiff must also show that the constitutional violation caused his injuries.

Marsh, 268 F.3d at 1028. In this case, the court finds that the officers' failure to administer prescription medicine to plaintiffs in jail did not pose a substantial risk of serious harm of which

the officials were aware existed.   Herbert Styron admitted that he was given his prescribed

blood-pressure medicine at the jail.  As for the pain medication, Herbert Styron claims he gave

the officers a slip of paper that he <u>thinks</u> was a prescription for the medicine, but he does not

know what it actually said.  Even if the slip of paper contained instructions on how to take the

pain medication, plaintiff does not know when it indicated he should receive the medicine.   As

such, there is no evidence that the officers knew the medication had been prescribed.  Nor is

there evidence that the failure to administer the pain medication posed a substantial risk of

serious harm.  There is also no evidence that any medicine had been prescribed for Terry Styron

at the time he was in custody.  He was diagnosed later with hernias, but neither he nor the

officers were aware of his condition at the time of his arrest.  In addition, there is no indication

that Terry Styron's condition was caused by his failure to receive any medication.

As to the failure of the officers to provide plaintiffs with blankets, the court finds such

conduct does not rise to the level of a constitutional or federal violation.  The officers' failure to

provide blankets to plaintiffs in jail did not pose a substantial risk of serious harm of which the

officials were aware existed.   Herbert Styron claims he was cold during the night and early

morning after his arrest, but he did not complain about the temperature until the next morning.  If

the officers were aware of Styron's need for a blanket, their failure to provide one may have

resulted in Styron being uncomfortable, but was not substantially likely to cause serious harm.

As to plaintiffs' claims that the defendant officers refused to allow plaintiffs to wash the

spray out of their eyes while in jail, the court finds that the evidence does not support their claim.

Plaintiffs were allowed to wash their eyes out.  Terry Styron even admitted that he was given a

wash cloth to do so.  Plaintiffs contention appears to be that they should have been allowed to

wash the pepper spray out sooner.  However, the court finds that the delay does not rise to the

level of a constitutional violation.  The delay did not pose a substantial risk of serious harm of

which the officials were subjectively aware existed.   Terry Styron was allowed to begin washing

the pepper spray from his eyes when he arrived at the jail.  While he contends that he was not

allowed to finish washing until an hour later, there is no indication that the delay posed a serious risk of harm.  As to Herbert Styron, he was taken to the hospital prior to being transported to the jail, and there is no indication that he needed to wash his eyes out when he arrived at the jail.

Lastly, plaintiffs assert that the officers failed to release plaintiffs when plaintiffs had been released on bail by a Court officer.  Terry Styron states that a county officer came to pick him up and take him to Bay Minette three times, but was told that the paperwork was not completed.  Terry Styron also claims he overheard officers talking on the phone reporting that the deputy had not come yet to pick up Terry Styron, when, in fact, the deputy was standing at the desk.  There is no testimony about how long of a delay there was in plaintiffs' release.  Nor is there any evidence that the reason given for not releasing plaintiffs - that the paperwork was not yet completed - was false.  The only real evidence of wrongdoing on behalf of the officers is plaintiffs' report that he overheard one side of an unnamed officer's telephone conversation.

Even if any of the claimed conduct violated plaintiffs' constitutional rights, defendants are still entitled to qualified immunity unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2733, 73 L.Ed.2d 396 (1982).  The right was "clearly established," if at the time of the incident, the "pre-existing law...dictate[s], that is, truly compel[s]...the conclusion for every like-situated reasonable government agent that what defendant [was] doing violate[d] federal law in the circumstances." Lassiter v. Alabama A&M Univ., 28 F.3d 1146, 1150 (11th Cir.1994).  The plaintiff may not discharge his burden "by referring to general rules and to the violation of abstract 'rights'." Id. at 1150.  Qualified immunity is evaluated on the basis of what the official knew at the time of the challenged action, not "by hindsight, based on later events." Id. at 1150.  The court notes that plaintiffs have only argued that qualified immunity did not apply to their excessive force claims.  The court finds that defendants' alleged violations of failing to administer the pain medication, not allowing Terry Styron to finish washing the pepper spray from his eyes until after he was checked in and put in

18

his cell, failing to provide blankets in jail, and delaying their release do not constitute violations of clearly established statutory or constitutional rights.   Plaintiffs have not shown that preexisting law compels the conclusion that all reasonable officers in defendants' position would know that their actions violated plaintiffs' federal rights.

In order to state a claim under § 1983 against the City of Foley, plaintiffs must allege that they suffered a constitutional injury, and that their injury was caused by "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dept. of Soc. Servs., 436 U.S. 658, 690 (1978).  A municipality cannot be held liable under §1983 solely because it employs a tortfeasor. Id. at 2035.   In Board of the County Commissioners of Bryan County v. Brown, 520 U.S. 397, 117 S.Ct. 1382 (1997), the test set out above by Monell was subsequently narrowed by the Supreme Court when it stated:

> [I]t is not enough for a § 1983 plaintiff to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

Brown, 520 U.S. at 404, 117 S.Ct. at 1388.   The plaintiff's burden is heavy.  As noted by the Eleventh Circuit Court of Appeals:

> This high standard of proof is intentionally onerous for plaintiffs; imposing liability on a municipality without proof that a specific policy caused a particular violation would equate to subjecting the municipality to respondeat superior liability-a result never intended by section 1983. As the Supreme Court has explained, '[t]o adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in de facto respondeat superior liability on municipalities ....' " (citing City of Canton [v. Harris], 109 S.Ct. [1197] at 1206 [(1989)]); see also Brown, [520 U.S.] at 415-16, 117 S.Ct. at 1394 ("Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.").

Gold v. City of Miami, 151 F.3d 1346, 1351 n. 10 (11th Cir.1998). Under § 1983, the "requisite

degree of culpability" is that the municipality acted with at least "deliberate indifference" to the consequences of its actions.  Plaintiffs must show not only that the municipal officers violated their constitutional rights, but that the City's policies were the "moving force" behind their injury.  "A finding of culpability cannot depend simply on the mere probability that any officer inadequately screened will inflict any constitutional injury, but must instead depend on a finding that the particular officer was 'highly likely to inflict the <u>particular</u> injury suffered by the plaintiff.'" <u>Romero v. City of Clanton</u>, 220 F.Supp.2d 1313, 1317 (M.D. Ala. 2002) (quoting <u>Brown</u>, 520 U.S. at 412) (emphasis in original).  "[O]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the 'plainly obvious consequence of the decision to hire the applicant would be a deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute deliberate indifference.'" <u>Raby v. Baptist Medical Center</u>, 21 F.Supp.2d 1341, 1353 (M.D. Ala.1998) (quoting  <u>Brown</u>, 520 U.S. at 411).

Plaintiffs assert that the City's failure to properly train and supervise officers amounts to a municipal policy.  The failure to train employees in a particular area can amount to municipal policy, but, as stated above, that policy must amount to "deliberate indifference" to the rights of the City's citizens. <u>Brown</u>, 520 U.S. at 398.  There was testimony that the officers on duty at the jail were trusted to provide proper treatment to inmates without Chief Miller checking up on the officers.  The court does not find that such action, or inaction, without more, constitutes "deliberate indifference" to the inmates' rights.   Moreover, the Eleventh Circuit has held that without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise. <u>Church v. City of Huntsville</u>, 30 F.3d 1332, 1342-46 (11th Cir.1994), (holding that the plaintiffs were not likely to succeed on the merits of their failure-to-train claim without proof that the City was aware of a prior incident in which constitutional rights were similarly violated); <u>see</u> <u>also</u> <u>Popham v. City of Talladega</u>, 908 F.2d 1561, 1564-65 (11th Cir.1990) (finding no liability for failure to train when no pattern of

incidents put the City on notice of a need to train).  Plaintiffs assert that because Chief James Miller was aware that the City of Foley had previously been sued before for mistreatment and failure to provide medical attention, that the City was aware of the need to train and supervise. (Miller Depo. p. 23).   However, the previous case referred to by plaintiffs, O'Gwynn v. City of Foley, Case No. 00-cv-00273-CB-S, Doc. 124, concerned the alleged failure of the City of Foley to adequately train officers regarding the handling of the mentally ill.  Moreover, summary judgment was granted in favor of the City of Foley.  The court finds that the O'Gwynn case did not put the City on notice that the problems alleged in this case were likely to occur.  Plaintiffs have presented no other evidence that the City was aware of a need for additional training or supervision in the treatment of inmates.  Moreover, as discussed above regarding the individual officers' liability under § 1983, the court finds that plaintiffs have not shown a constitutional violation.  Nor does it appear that the City's "policy" was the "moving force" behind the alleged constitutional violation.  As stated above, a city cannot be held liable under §1983 for employing a tortfeasor, there must be some culpability on the City itself.

## CONCLUSION

For the reasons stated above, the motion of defendants, City Of Foley, James Miller, James Brown, Bruce Thrift, Darren Miller, Tony Nelson and Heidi Loftis, for summary judgment (Doc. 44) is **GRANTED**.  The court notes that the only remaining claims in this case are the counterclaims of James Brown, Darren Miller, Tony Nelson and Heidi Loftis for assault and battery. (Doc. 33).

**DONE and ORDERED** this 18th day of November, 2005.

/s/ Callie V. S. Granade
CHIEF UNITED STATES DISTRICT JUDGE